Kenneth B. Black (5588)
ken.black@stoel.com
Wesley F. Harward (15623)
wesley.harward@stoel.com
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone:  801.328.3131

*Attorneys for Quartzdyne, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DISTRICT

| | |
|---|---|
| QUARTZDYNE, INC., a Delaware corporation,<br><br>             Plaintiff,<br><br>        v.<br><br>PRECIS, LLC, a Utah limited liability company; LON PERRY, an individual; and SCOTT BROWN, an individual,<br><br>             Defendants. | **COMPLAINT**<br><br>Case No. 2:20-cv-00634-JNP<br><br>The Honorable Jill N. Parrish |

## THE PARTIES, JURISDICTION, AND VENUE

1.    Quartzdyne, Inc. ("Quartzdyne") is a Delaware corporation with its principal place of business in Salt Lake City, Utah.

2.    Precis, LLC ("Precis") is a Utah limited liability company with its principal place of business in South Jordan, Utah.

3.    Lon Perry is an individual and a Utah resident.

4.    Scott Brown is an individual and a Utah resident.

107572108.9 0052702-00002

5.    This Court has subject matter jurisdiction over the federal Defend

Trade Secrets Act claim pursuant to 18 U.S.C. § 1836 and 28 U.S.C. § 1331.  This

Court also has supplemental jurisdiction over the non-federal claims pursuant to 28

U.S.C. § 1367.

6.    This Court has general personal jurisdiction over Mr. Perry, Mr.

Brown, and Precis (collectively, "Defendants") as residents of Utah.

7.    Venue in this Court is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

**A.    Quartzdyne's Business and Trade Secrets.**

8.    Quartzdyne designs and manufactures industry-leading resonating

quartz pressure transducers and sensors for the down-hole oil and gas industry.

9.    Quartzdyne's sensors detect and transmit the bottom hole pressure in

oil and gas wells.  Accurate sensor readings are essential to optimize resource

production and to avoid "stranding" oil and gas resources.  The use of Quartzdyne

sensors in conjunction with production in a given well can lead to a substantial

increase in resource production on each well.

10.    Quartzdyne is world-renowned for providing accurate, low-drift, high-

resolution data in the most extreme conditions.  Quartzdyne's typical calibrations

2

can result in less than 1.0 psi error for a 10 kpsi transducer across the calibrated temperature range.

11.     Quartzdyne has carefully developed its proprietary technology and manufacturing techniques and processes for its sensors and transducers over the past 30 years.

12.     Quartzdyne sells its products to over 150 global customers, including some of the largest oil and gas production companies in the world.

13.     Quartzdyne has a number of trade secrets it uses in the design and manufacture of its products to meet the needs of Quartzdyne's customers.

14.     For example, down-hole oil and gas customers require stable, predictable, reliable, and accurate pressure data.  Quartzdyne has, among other things, proprietary methods, techniques, processes, adhesives, and fixturing that produce stable and predictable pressure measurement sensors.

15.     Down-hole oil and gas customers also require accurate pressure measurement data.  Quartzdyne has proprietary methods, tooling, equipment, techniques, and procedures for mitigating phenomena that reduce quartz sensor accuracy.

16.     Down-hole oil and gas customers also require reliable sensors.  Drive level sensitivity ("DLS") is a scientific phenomenon that can cause a sensor to fail

3

to function reliably.  Quartzdyne has proprietary methods, equipment, techniques, and processes that minimize DLS.

17.    Quartzdyne also has customer specifications and vendor lists that were acquired by lengthy and expensive efforts over many years.  This information includes the performance requirements of customers and the exact products needed to achieve this performance.

18.    Quartzdyne has invested very substantial time and resources to develop and protect its confidential information and trade secrets related to its products.  Quartzdyne's innovation and development have positioned it as a leader in its industry.  Any improper or unauthorized use or disclosure of Quartzdyne's proprietary information would seriously harm Quartzdyne.

19.    Quartzdyne takes reasonable measures to protect its trade secrets and confidential information.  Those measures include requiring employees to enter into non-disclosure agreements; training employees on how to use, treat, and protect trade secrets; storing digital information about its trade secrets on restricted portions of Quartzdyne's network; and limiting access to Quartzdyne's physical facilities.

**B.    Mr. Perry's and Mr. Brown's Former Employment with Quartzdyne.**

20.    Mr. Perry was hired by Quartzdyne in 1993 as a mechanical engineer.

4

21.     Mr. Brown was hired by Quartzdyne in 1999 as a mechanical engineer.

22.     Mr. Perry and Mr. Brown both signed confidentiality and non-disclosure agreements in conjunction with their employment with Quartzdyne.

23.     In 1998, Quartzdyne was purchased by Dover Corporation ("Dover"). At that time, Quartzdyne retained its status as a distinct legal entity and became a wholly-owned subsidiary of Dover.

24.     Over the years, Mr. Perry and Mr. Brown were promoted to high-level leadership roles with Quartzdyne.  In 2009, Mr. Perry was named President of Quartzdyne, and Mr. Brown was made Vice President of Sales.  In 2010, Mr. Brown was made Vice President of Engineering.

25.     Mr. Perry and Mr. Brown, by virtue of their employment as the former President and Vice President of Quartzdyne, respectively, were afforded access to Quartzdyne's trade secrets and confidential information.

26.     Mr. Perry announced his intention to leave Quartzdyne on August 3, 2015.

27.     In conjunction with his departure, Mr. Perry entered into a separation agreement with Dover, effective September 30, 2015 (the "Perry Severance Agreement").

5

28.    The Perry Severance Agreement provided that Mr. Perry would receive certain severance payments.  Dover paid in full to Mr. Perry the severance payments called for in the Perry Severance Agreement.

29.    In exchange, Mr. Perry agreed to certain post-employment covenants. Specifically, he agreed to non-disclosure, non-competition, and non-solicitation covenants.

30.    The Perry Severance Agreement prohibited Mr. Perry, for a period of one year, from competing against Quartzdyne or from researching, planning, preparing, or developing any products that compete with Quartzdyne's products.

31.    The Perry Severance Agreement prohibited Mr. Perry, for a period of one year, from soliciting any Quartzdyne employee for employment, or otherwise encouraging any Quartzdyne employee to terminate his or her employment with Quartzdyne.

32.    The Perry Severance Agreement also prohibits Mr. Perry from divulging or using Quartzdyne's confidential information (including its trade secrets).

33.    The Perry Severance Agreement was assigned to Quartzdyne.

34.    After Mr. Perry announced his plan to resign, Dover interviewed Quartzdyne employees to select a new President to replace Mr. Perry.

35.    Mr. Brown was interviewed but ultimately was not selected as President.  Within days of being informed that he would not be Quartzdyne's new President, Mr. Brown indicated he would resign immediately if Dover did not enter into a retention agreement with him.

36.    Ultimately, Quartzdyne and Mr. Brown negotiated a separation agreement whereby Mr. Brown remained a full-time employee of Quartzdyne through January 4, 2016 (the "Brown Separation Agreement").  After that time, Mr. Brown's employment with Quartzdyne was terminated.

37.    As consideration for the Brown Separation Agreement, Mr. Brown received, among other things, a lump-sum payment from Quartzdyne.

38.    Like Mr. Perry, Mr. Brown also agreed to certain post-employment covenants.  Specifically, he agreed to non-disclosure, non-competition, and non-solicitation covenants.

39.    The Brown Separation Agreement prohibited Mr. Brown, for a period of one year, from competing against Quartzdyne or from researching, planning, preparing, or developing any products that compete with Quartzdyne's products.

40.    The Brown Separation Agreement prohibited Mr. Brown, for a period of one year, from soliciting any Quartzdyne employee for employment or

otherwise encouraging any Quartzdyne employee to terminate his or her employment with Quartzdyne.

41.    The Brown Separation Agreement also prohibits Mr. Brown from divulging or using Quartzdyne's confidential information (including its trade secrets).

**C.    Mr. Perry and Mr. Brown Breach Their Agreements, Form Precis to Compete Against Quartzdyne, and Misappropriate Quartzdyne's Trade Secrets.**

42.    Since their departure from Quartzdyne and upon information and belief, Mr. Perry and Mr. Brown have worked together to misappropriate Quartzdyne's trade secrets and to disclose and use those secrets to compete directly with Quartzdyne.

43.    Mr. Perry and Mr. Brown, either directly or through entities they own and/or control, formed Precis.  Precis was registered with the State of Utah on January 9, 2017—just days after the term of Mr. Brown's non-competition provision expired.  Precis's certificate of organization lists its purpose as "[m]anufacturing instruments that measure conditions in a down-hole oil or gas well."

44.    Upon information and belief, Mr. Perry and Mr. Brown began researching, planning, preparing, and developing products that compete against

8

Quartzdyne's products during the non-competition periods in violation of their agreements.

45.    Upon information and belief, Mr. Perry and Mr. Brown also contacted Quartzdyne's existing and former customers during the non-competition periods to begin researching and marketing and/or preparing to research and market products that compete against Quartzdyne's products in violation of their agreements.

46.    Upon information and belief, Mr. Perry and Mr. Brown, as founders of Precis, used and disclosed to Precis Quartzdyne's confidential and proprietary information and trade secrets for use in direct competition with Quartzdyne.

47.    Mr. Perry and Mr. Brown also violated the terms of their non-solicitation agreement by soliciting Quartzdyne employees.

48.    For example, Mr. Perry and Mr. Brown contacted Shane Rose, an electrical engineer at Quartzdyne, in September 2016.  Mr. Perry and Mr. Brown solicited Mr. Rose to leave Quartzdyne and offered Mr. Rose employment with a new venture.

49.    By July 2020, Precis announced that it had created "micro pressure crystals."  These are the same type of quartz crystals manufactured and sold by Quartzdyne for use in down-hole oil and gas well pressure sensors.

9

50.     Precis published photographs of its quartz pressure sensors.  Copies of the photographs are attached as Exhibit A.

51.     The similarities between Precis's quartz pressure sensors and Quartzdyne's quartz pressure sensors are striking.  Example photographs of Quartzdyne's quartz pressure sensors are attached as Exhibit B.

52.     For example, the equivalent circuit parameters in Precis's published specifications are nearly identical to Quartzdyne's standard pressure sensors.  A copy of Precis's QPC Series Specification Sheet is attached as Exhibit C.

| Parameter | Precis QPC series | Quartzdyne Pressure Crystals |
|---|---|---|
| *Overtone* | Third | Third |
| *Series Resistance* | 50 ± 15 Ω | 53.1 Ω |
| *Motional Capacitance* | 0.43 fF (typical) | 0.438 fF |
| *Inductance* | 1.11 H (typical) | 1.109 H |

53.     Upon information and belief, Mr. Perry, Mr. Brown, and Precis have used and/or disclosed Quartzdyne's trade secrets in conjunction with the development and manufacture of Precis's quartz pressure sensors.

54.     For example, and upon information and belief, Precis utilizes a glass-sealing process identical to, similar to, and/or based upon Quartzdyne's proprietary sealing process.

10

55.     Upon information and belief, Precis is currently attempting to market its quartz pressure sensors to Quartzdyne's current and potential customers.

56.     It takes significant resources as well as numerous, complex, and innovative design, engineering, and manufacturing phases to perfect and troubleshoot Quartzdyne's crystals and sensors.  Indeed, Quartzdyne has developed and refined its products over the course of 30 years.

57.     Upon information and belief, Mr. Perry, Mr. Brown, and Precis did not independently develop—and could not have independently developed— its products without using Quartzdyne's confidential information and trade secrets.

58.     Upon information and belief, without Quartzdyne's trade secrets, Mr. Perry, Mr. Brown, and Precis could not have developed the ability to manufacture sensor-based products now or in the near future, as Precis claims it has done and intends to do.

## FIRST CLAIM FOR RELIEF
(Breach of Contract Against Mr. Perry)

59.     Quartzdyne hereby incorporates by reference the allegations set forth in the preceding paragraphs as though set forth fully herein.

60.     The Perry Severance Agreement is a valid and enforceable contract between Mr. Perry and Quartzdyne.

107572108.9 0052702-00002

61.     Quartzdyne (and its predecessors-in-interest) has fully performed its obligations under the Perry Severance Agreement.

62.     Mr. Perry breached the Perry Severance Agreement in at least the following ways:

(a)     Planning, researching, and developing competing products during the non-competition period;

(b)     Soliciting Quartzdyne's employees during the non-solicitation period; and

(c)     Disclosing and/or using Quartzdyne's confidential information and trade secrets.

63.     As a direct and proximate result of Mr. Perry's breach of contract, Quartzdyne has suffered, and continues to suffer, damages in an amount to be determined at trial.

64.     As a direct and proximate result of Mr. Perry's breach of contract, Quartzdyne also has suffered, and continues to suffer, irreparable harm and is entitled to injunctive relief to prevent further breaches.

65.     Quartzdyne is also entitled to recover its attorneys' fees and costs of this action pursuant to the Perry Severance Agreement.

## SECOND CLAIM FOR RELIEF
(Breach of Contract Against Mr. Brown)

66.    Quartzdyne hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

67.    The Brown Separation Agreement is a valid and enforceable contract between Mr. Brown and Quartzdyne.

68.    Quartzdyne has fully performed its obligations under the Brown Separation Agreement.

69.    Mr. Brown breached the Brown Separation Agreement in at least the following ways:

(a)    Planning, researching, and developing competing products during the non-competition period;

(b)    Soliciting Quartzdyne's employees during the non-solicitation period; and

(c)    Disclosing and/or using Quartzdyne's confidential information and trade secrets.

70.    As a direct and proximate result of Mr. Brown's breach of contract, Quartzdyne has suffered, and continues to suffer, damages in an amount to be determined at trial.

13

71.     As a direct and proximate result of Mr. Brown's breach of contract, Quartzdyne also has suffered, and continues to suffer, irreparable harm and is entitled to injunctive relief to prevent further breaches.

72.     Quartzdyne is also entitled to recover its attorneys' fees and costs of this action pursuant to the Brown Separation Agreement.

**THIRD CLAIM FOR RELIEF**
(Violation of the Federal Defend Trade Secrets Act Brought Against All Defendants)

73.     Quartzdyne hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

74.     Quartzdyne owns confidential, proprietary, technical, or business information, including but not limited to engineering and manufacturing processes, plans, and techniques, which information constitutes trade secrets under the Defend Trade Secrets Act.  *See* 18 U.S.C. § 1836, *et seq*.

75.     Mr. Perry and Mr. Brown, by virtue of their employment as the former President of Quartzdyne and former Vice President of Sales and then Engineering of Quartzdyne, respectively, were afforded access to all of Quartzdyne's trade secret information.

14

76.     Upon information and belief, Mr. Perry and Mr. Brown have improperly used and/or disclosed, or will inevitably use and/or disclose, this information, including use and disclosure with and to Precis.

77.     These trade secrets are related to the development and manufacture of the products and services that are sold and installed throughout the United States and otherwise used in interstate commerce.

78.     Upon information and belief, Mr. Perry and Mr. Brown disclosed and/or used Quartzdyne's trade secrets to start, manage, operate, and control a competing business through Precis that would manufacture and sell products with specifications and features substantially similar to Quartzdyne's products.

79.     Upon information and belief, during 2017 and continuing thereafter, Defendants used Quartzdyne's trade secrets, knowing that they acquired and derived the trade secrets by breaching the duty to Quartzdyne to maintain their secrecy.

80.     Upon information and belief, Defendants are attempting to use Quartzdyne's trade secrets to solicit business from and sell to Quartzdyne's current and former customers in direct competition with Quartzdyne.  Defendants did not and could not develop and manufacture Precis's products without using and/or disclosing Quartzdyne's trade secrets.  Quartzdyne has suffered and will continue

15

to suffer damage from Defendants' use and disclosure of Quartzdyne's trade secrets.

81.    Quartzdyne derives independent economic value, both actual and potential, from its trade secrets not being generally known to the public and not being readily ascertainable through proper means to other persons who can obtain economic value from their disclosure or use.

82.    Quartzdyne took reasonable efforts to maintain the secrecy of its trade secrets, including, among other things, by requiring its employees like Mr. Perry and Mr. Brown to sign agreements prohibiting the disclosure of trade secret information.

83.    As a direct and proximate result of Defendants' conduct, Quartzdyne also has suffered, and continues to suffer, irreparable harm.

84.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), Quartzdyne is entitled to recover both the actual loss caused by the misappropriation and the unjust enrichment (including a disgorgement of Defendants' profits) that is not taken into account in computing actual loss.

85.    Quartzdyne is also entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A) to prevent any actual or threatened misappropriation of Quartzdyne's trade secrets.

107572108.9 0052702-00002

86.    Defendants have misappropriated Quartzdyne's confidential, proprietary, and trade secret information willfully and maliciously.  Accordingly, Quartzdyne is entitled to an award of its attorneys' fees and an award of exemplary damages, pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

## FOURTH CLAIM FOR RELIEF
(Violation of the Utah Uniform Trade Secrets Act Brought Against All Defendants)

87.    Quartzdyne hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

88.    Quartzdyne owns confidential, proprietary, technical, or business information, including but not limited to engineering and manufacturing processes, plans, and techniques, which information constitutes trade secrets under the Utah Uniform Trade Secrets Act.  *See* Utah Code § 13-24-1, *et seq*.

89.    Mr. Perry and Mr. Brown, by virtue of their employment as the former President and former Vice President of Quartzdyne, respectively, had access to Quartzdyne's trade secret information.  Upon information and belief, this information was improperly disclosed to Precis.

90.    Upon information and belief, Mr. Perry and Mr. Brown disclosed and/or used, or will inevitably disclose and/or use, Quartzdyne's trade secrets in order to start, manage, operate, and control a competing business through Precis

17

that would manufacture and sell products with specifications and features substantially similar to Quartzdyne's products.

91.    Upon information and belief, during 2017 and continuing thereafter, Defendants used Quartzdyne's trade secrets, knowing that they acquired and derived the trade secrets by breaching the duty to Quartzdyne to maintain their secrecy.

92.    Upon information and belief, Defendants are attempting to use Quartzdyne's trade secrets to solicit business from and sell to Quartzdyne's former customers in direct competition with Quartzdyne.  Defendants could not develop and manufacture such products in such a short time period without the use of Quartzdyne's trade secrets.  Quartzdyne has suffered and will continue to suffer damage from Defendants' misappropriation of Quartzdyne's trade secrets.

93.    Quartzdyne derives independent economic value, both actual and potential, from its trade secrets not being generally known to the public and not being readily ascertainable through proper means to other persons who can obtain economic value from their disclosure or use.

94.    Quartzdyne took reasonable efforts to maintain the secrecy of its trade secrets, including, among other things, by requiring its employees like Mr. Perry

and Mr. Brown to sign agreements prohibiting the disclosure of trade secret information.

95.    As a direct and proximate result of Defendants' conduct, Quartzdyne also has suffered, and continues to suffer, irreparable harm.

96.    Pursuant to Utah Code § 13-24-4(1), Quartzdyne is entitled to recover both the actual loss caused by the misappropriation and the unjust enrichment (including a disgorgement of Defendants' profits) that is not taken into account in computing actual loss.

97.    Quartzdyne is also entitled to an injunction under Utah Code § 13-24-3 to prevent any actual or threatened misappropriation of Quartzdyne's trade secrets.

98.    Defendants have misappropriated willfully and maliciously Quartzdyne's confidential, proprietary, and trade secret information.  Accordingly, Quartzdyne is entitled to an award of its attorneys' fees and an award of exemplary damages, pursuant to Utah Code §§ 13-24-4 and -5.

107572108.9 0052702-00002

## **PRAYER FOR RELIEF**

Wherefore, Quartzdyne prays for judgment as follows:

A.     An order finding that Quartzdyne has been damaged by Defendants'
conduct and an award of damages in an amount to be determined at trial but in no
event less than Quartzdyne's lost profits.

B.     An order finding that Mr. Perry and Mr. Brown breached their
respective agreements and an award of damages to be determined at trial but in no
event less than the payments received by Mr. Perry and Mr. Brown pursuant to
those agreements.

C.     An order finding that Defendants have been unjustly enriched by their
conduct and that Defendants are liable to Quartzdyne for disgorgement of profits in
an amount to be determined at trial but in no event less than restitution of any
revenues or other benefit obtained by Defendants as a result of their conduct.

D.     An order awarding damages for harm caused to Quartzdyne by
Defendants' misappropriation of Quartzdyne's trade secrets.

E.     An order awarding exemplary damages of twice the damages caused
to Quartzdyne by Defendants' willful and malicious misappropriation of
Quartzdyne's trade secrets.

20

F.      An order awarding Quartzdyne, as the prevailing party, reasonable attorneys' fees as deemed appropriate by the Court.

G.      An injunction ordering all Defendants to cease using and disclosing Quartzdyne's trade secrets.

H.      An award of costs to Quartzdyne, as the prevailing party, as provided in the agreements and as deemed appropriate by the Court.

I.      Pre-judgment and post-judgment interest at the maximum rate provided by law.

J.      Such other and further relief as this Court may deem appropriate under the circumstances.

DATED:  September 10, 2020

STOEL RIVES LLP

*/s/ Kenneth B. Black*
Kenneth B. Black
Wesley F. Harward

*Attorneys for Quartzdyne, Inc.*

107572108.9 0052702-00002